# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WENDY KNOX and RICHARD DOTSON<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, KENNETH LEE SALAZAR, Secretary of the Interior, and C.L. OTTER, Governor of the State of Idaho,<br><br>Defendants. | Case No. 4:CV 09-162-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it motions to dismiss filed by the two defendants, Idaho's Governor and the United States, and a motion to amend filed by plaintiffs. The Court heard oral argument, and took the motions under advisement. The Court allowed further briefing on the motion to amend, which was completed on November 30, 2010. For the reasons stated below, the Court will grant the Governor's motion to dismiss but deny the Secretary's motion to dismiss. This action will proceed under the Administrative Procedures Act as a judicial review of the Secretary's decision to approve video gaming for the four Idaho Tribes.

# FACTUAL BACKGROUND

## Plaintiffs Knox & Dotson

Plaintiffs Wendy Knox and Richard Dotson live near the Fort Hall Casino operated by the Shoshone Bannock Tribes on their reservation lands. *See Amended Complaint, Dkt. 4 at ¶ 28.* Knox and Dotson allege that they both became "compulsive gamblers" after the Fort Hall Casino installed slot machines following the enactment of Idaho Code §§ 67-429B and 67-429C by the Idaho legislature. *Id.* Knox and Dotson gamble "almost exclusively" at Fort Hall Casino "because of its close proximity to their respective residences, compared to the next nearest casino gambling establishments located hundreds of miles away." *Id.* Of all the different types of gambling available at the Fort Hall Casino, Knox and Dotson played only the slot machines. *Id.* They allege that "[b]ecause of the slot machines at the Fort Hall Casino, [they] both developed clinical and devastating addictions to gambling at the Fort Hall Casino." *Id.*

Knox estimates her slot machine losses at Fort Hall Casino at about $50,000.00, and Dotson estimates his slot machine losses at Fort Hall Casino at about $30,000.00. *Id.* They also incurred additional debt they otherwise would not have incurred, "were subjected to intrusive and humiliating collection efforts, stress, anxiety and marital and family strife, and tremendous emotional distress." *Id.* Dotson lost his house and job, and was convicted of the crime of forgery in order to obtain gambling funds. *Id.* Both plaintiffs continue to receive treatment for their destructive gambling addictions through Gambler's Anonymous. *Id.* Dotson has also obtained counseling from a private licensed

counselor for his gambling addiction.  *Id.*

The plaintiffs allege that "[i]f the defendants had originally acted in accordance with [Indian Gaming Regulatory Act] and the Johnson Act, the slot machines would not have been installed at Fort Hall Casino, or would have been removed therefrom, and neither Plaintiff would have suffered the harm set forth above."  *Id.*  They allege that if the Court declares that the slot machines violate the law, "Fort Hall Casino will be forced to remove its slot machines, and such gambling would be much less readily available to Plaintiffs, dramatically speeding and increasing their recovery from gambling addiction and preventing or minimizing further harm to the Plaintiffs of the kind set forth above. *Id.*

**Indian Gaming Regulatory Act & Johnson Act**

In 1988, Congress passed the Indian Gaming Regulatory Act (IGRA) to create "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation."  *See* 25 U.S.C. §§ 2702(1), (2).  The IGRA was also intended "as a means of granting states some role in the regulation of Indian gaming."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 n.11 (9th Cir. 2003).

The IGRA creates three classes of gaming, each of which is subject to a different level of regulation.  Class I and II gaming includes social games, bingo, and card games.

*See* 25 U.S.C. §§ 2703(6) & 2703(7)(A)(ii). Class III gaming includes the tribal video gaming machines at issue in this case. *Id.* § 2703(8). Class III gaming may be conducted on Indian lands if it is: (1) authorized by the tribe seeking to conduct the gaming; (2) located in a State that does not bar such gaming; and (3) "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State. . . ." *See* 25 U.S.C. § 2710(d)(1).

The IGRA authorizes states to negotiate compacts with tribes that are located within their borders regarding aspects of Class III Indian gaming that might affect legitimate state interests. *See* 25 U.S.C. § 2710(d)(3)(C). This compacting process gives regulatory authority to states, while granting to tribes the ability to offer legal Class III gaming. *Artichoke Joe's*, 353 F.3d at 716.

The Secretary of the Interior must approve the compact, and it does not take effect until notice of that approval has been published by the Secretary in the Federal Register. *See* 25 U.S.C. § 2710(d)(8) & (3)(B). If the Secretary does not approve or disapprove the compact within 45 days after it has been submitted to the Secretary, it is considered approved, but only to the extent it is consistent with IGRA. *See* 25 U.S.C. § 2710(d)(8)(C).

Under a criminal law in place before the IGRA was enacted – the Johnson Act – slot machines are banned in Indian country. *See* 15 U.S.C. § 1171-78. However, the IGRA waives application of the Johnson Act if the slot-machine gaming is conducted under an effective Tribal-State compact that 'is entered into . . . by a State in which

gambling devices are legal." *Artichoke Joe's,* 353 F.3d at 720 n.11.

**State-Tribal Compacts**

Between 1992 and 2000, Idaho Governors entered into Class III gaming Compacts on the State's behalf with four of the five Idaho tribes: The Coeur d'Alene Tribe, the Kootenai Tribe, the Nez Perce Tribe, and, in 2000, the Shoshone Bannock Tribes. *See, e.g., 65 Fed.Reg. 54541-03 (Sept. 8, 2000) (approval of the SBT Compact by the Assistant Secretary of the Interior for Indian Affairs).* Each Compact was affirmatively approved by the Secretary. *See 58 Fed. Reg. 8478 (Feb. 12, 1993) (Coeur d'Alene Tribe Compact); 58 Fed. Reg. 59,926 (Nov. 10, 1993) (Kootenai Tribe Compact); 60 Fed. Reg. 57,246 (Nov. 14, 1995) (Nez Perce Tribe compact); 65 Fed. Reg. 54,541 (Sept. 8, 2000) (SBT Compact).*

Focusing on the Compact with the Shoshone Bannock Tribes, it was intended to "govern the licensing, regulation and operation of Class III gaming conducted by the Tribes on Indian Lands located within [Idaho]." *See Compact § 3(k).* The Compact authorizes the Tribes to conduct any Class III gaming activity "that the State of Idaho 'permits for any purpose by any person, organization, or entity,' as the phrase is interpreted in the [IGRA]." *See Compact § 4(a).*

When the Compact was negotiated, the Tribes and State could not agree on what types of Class III games Idaho allowed others to conduct. The State's position was that "the electronic gaming currently conducted by the Tribes in Idaho is an imitation of casino games and prohibited under Idaho and federal law." *See Idaho v. Shoshone-*

*Bannock Tribes*, 465 F.3d 1095, 1097 (9th Cir. 2006).  The Tribes' position was that "Idaho allowed all class III gaming except sports betting."  *Id.*  To settle their differences, the parties agreed to seek a declaratory judgment to determine which class III games the Compact authorized.

In 2001, the Tribes and State each filed suit in this Court seeking declaratory relief. *See Shoshone-Bannock Tribes v. Idaho*, Civil No. 4: Civ-01-52-BLW; *Idaho v. Shoshone-Bannock Tribes*, 4: Civ-01-171-BLW.  The Court consolidated the cases into a single case.

## Proposition One

About a year later, while the consolidated case was pending, the voters of Idaho adopted a ballot initiative called Proposition One, which purported to authorize Indian tribes to conduct gaming using "tribal video gaming machines." *Shoshone-Bannock Tribes*, 465 F.3d at 1097.  Proposition One added two sections to the Idaho Code, 67-429B and 67-429C.  Section 429B authorizes "Indian tribes . . . to conduct gaming using tribal video gaming machines pursuant to state-tribal gaming Compact which specifically permit their use." *See I.C. § 67-429B(1).*  Section 429C authorizes tribes to amend their gaming Compact to permit the use of tribal video gaming machines. *See I.C. § 67-429C.*  Once a Compact is so amended, the statute requires that the number of gaming machines be limited and that the Tribe contribute 5% of the net gaming income to local educational programs and schools. *See I.C. § 67-429C(1)(c).*

Shortly after Proposition One became law, three of the Idaho tribes – the Coeur

d'Alenes, Kootenais, and Nez Perce – used the amendment procedure in § 67-429C to amend their Compacts with Idaho. *Shoshone-Bannock Tribes*, 465 F.3d at 1098. Again, the Secretary affirmatively approved each of the amendments. *See 68 Fed. Reg. 1068 (Jan. 8, 2003) (Coeur d'Alene Tribe Compact addendum); 68 Fed. Reg. 1068 (Jan. 8, 2003) (Kootenai Tribe Compact amendment); 68 Fed. Reg. 1068 (Jan. 8, 2003) (Nez Perce Tribe Compact addendum approval).* The amendments granted these three Tribes the right to operate tribal video gaming machines, subject to the statute's limitations of numbers and requirements of school payments. *Id.* The Shoshone Bannock Tribes did not follow this course but continued with their litigation in this Court.

**Further Litigation In This Court**

In the litigation before this Court, the State had originally taken the position that video gaming machines were banned by the Idaho Constitution. *See Idaho Const. Art. III, § 20(2).* That constitutional provision prohibits, among other things, "slot machines" and "any electronic or electromechanical imitation or simulation of any form of casino gambling." *Id.* To give effect to this constitutional provision, the Idaho Legislature enacted Idaho Code § 18-3810 to make it a misdemeanor to use or keep a "slot machine." The Idaho Supreme Court has held that the term "slot machine" was sufficiently definite, without further definition, to include video gaming machines. *See MDS Investments , L.L.C. v State*, 65 P.3d 197 (Id.Sup.Ct. 2003).

However, after the passage of Proposition One – and the amendment of the Compacts for the other three tribes to allow video gaming – the State dropped its

argument that video gaming violated the Idaho Constitution. In an apparent shift of strategy that sought to regulate rather than ban video gaming, the State now sought to compel the Tribes to renegotiate the Compact. *See Shoshone Bannock Tribes v State of Idaho, Case No. 4:CV-01-52-BLW (Memorandum Decision filed April 12, 2004)* at 8. The Tribes objected, pointing out that the Compact's "most favored nation" provision required that the Compact "shall be amended" whenever any other tribe is permitted to conduct any Class III games in Idaho. *Id*. This provision, the Tribes argued, entitled them to an amendment without renegotiation.

The Court agreed, and held that the "most favored nation" provision entitled the Tribes – without renegotiation – to "a brief written amendment" clarifying that they were authorized to operate "tribal video gaming machines" as that term in defined in Idaho Code § 67-429B. Because the State had dropped its argument that video gaming violated Idaho's constitution, and had agreed that the "most favored nation" provision allowed the Tribes to operate video gaming, the Court did not address the issue whether the video gaming violated Idaho's constitution.

**Ninth Circuit Appeal**

On appeal, the Ninth Circuit affirmed this Court. *Shoshone-Bannock Tribes*, 465 F.3d at 1095. The Circuit held that "[t]he Tribes are entitled to a mandatory amendment of the Compact stating that they are authorized to conduct tribal video gaming, as the other tribes have been permitted to do." *Id*. at 1102. The Circuit further held that the limitations on numbers of machines and the requirement of educational payments did not

apply to the Tribes.  *Id*.  The Circuit likewise never addressed the issue whether the Tribes' video gaming violated the Idaho constitution.

The Tribes have never submitted a proposed Compact amendment to the Secretary approving video gaming, and no amendment has been issued by the Secretary.

**Idaho Litigation**

In 2008, Knox and Dotson sued the State of Idaho and Governor Otter in state district court, alleging that Idaho Code §§ 67-429B and 67-429C violated the Idaho constitution.  The district court granted the defendants' motion to dismiss, finding that it was speculative whether the relief requested by plaintiffs (invalidation of the two statutes) would redress their claimed injuries by having the video gaming machines removed from the Fort Hall Casino.  The Idaho Supreme Court agreed, finding that the Ninth Circuit decision in *Shoshone-Bannock Tribes*, 465 F.3d at 1095, "would preclude further litigation between the State and the Tribes as to whether tribal video gaming was permissible under the Compact and whether the Compact is valid under IGRA."  *See Knox v. State ex.rel. Otter*, 223 P.3d 266, 280 (Id.Sup.Ct. 2009).  Furthermore, the court held, "there is not a substantial likelihood that [law enforcement] authorities would disregard the decision of the [Ninth Circuit] and seek to commence criminal prosecutions."  *Id*.  The court noted that "[n]othing herein should be read as expressing an opinion as to whether Proposition One is unconstitutional. . . ."  *Id*. at 280 n. 9.

**This Case**

Plaintiffs Knox and Dotson have sued the Secretary and Governor Otter seeking

declaratory and injunctive relief (1) setting aside the Secretary's approvals of all tribal Compacts in Idaho and declaring them in violation of the IGRA, the Johnson Act, and the APA; (2) rescinding the Compacts; and (3) declaring that all Class III gaming in Idaho is prohibited.

**Pending Motions**

The Secretary and the Governor have filed motions to dismiss under Rules 12(1), (6), and (7). The plaintiffs have filed a motion to amend their complaint. The Court will address first the standards of review that govern these motions, and then will resolve each motion.

## STANDARD OF REVIEW

**Rule 12(b)(1)**

Under Rule 12(b)(1), a complaint must be dismissed if the Court lacks subject matter jurisdiction to adjudicate the claims. In support of a motion to dismiss under Rule 12(b)(1), the moving party may submit affidavits or any other evidence. *Colwell v. Dept. of Health & Human Services*, 558 F.3d 1112 (9th Cir. 2009). It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction. *Id.*

**Rule 12(b)(6)**

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id*. at 557.

In a more recent case, the Supreme Court identified two "working principles" that underlie *Twombly*. *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id*. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 1950. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id*. "Determining whether a complaint states a plausible claim for relief will . . .

be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009)(issued 2 months after *Iqbal*).[1] The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.,* 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007)(citations omitted).

Under Rule 12(b)(6), the Court may consider matters that are subject to judicial notice. *Mullis v. United States Bank*, 828 F.2d 1385, 1388 (9th Cir. 1987). The Court may take judicial notice "of the records of state agencies and other undisputed matters of public record" without transforming the motions to dismiss into motions for summary

---

[1] The Court has some concern about the continued vitality of the liberal amendment policy adopted in *Harris v. Amgen*, based as it is on language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), suggesting that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim. . .." Given *Twombly* and *Iqbal*'s rejection of the liberal pleading standards adopted by *Conley,* a question arises whether the liberal amendment policy of *Harris v Amgen* still exists. Nevertheless, the Circuit has continued to apply the liberal amendment policy even after dismissing claims for violating *Iqbal* and *Twombly. See Market Trading, Inc. v. AT&T Mobility, LLC*, 2010 WL 2836092 (9th Cir. July 20, 2010) (not for publication). Accordingly, the Court will continue to employ the liberal amendment policy.

judgment.  *Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866

(9th Cir. 2004)**.**  The Court may also examine documents referred to in the complaint,

although not attached thereto, without transforming the motion to dismiss into a motion

for summary judgment.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

**Rule 12(b)(7)**

Rule 12(b)(7) allows for dismissal if an absent party – required to be joined under

Rule 19 – cannot be joined.

**Motion to Amend**

Leave to amend should be granted whenever "justice so requires," Fed.R.Civ.P.

15(a)(2), and requests for leave should be granted with "extreme liberality."  *Moss v. U.S.*

*Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009).  Nevertheless, the Court may deny leave

to amend if it would be a mere "exercise in futility."  *Leadsinger, Inc. v. BMG Music*

*Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

## ANALYSIS

**Motion To Amend Complaint**

Plaintiffs have filed a motion to amend their complaint to add the Tribes as a

defendant and to add an alternative claim for relief that involves ordering the Tribes to

amend the Compact as set forth in the Ninth Circuit's decision in *Shoshone-Bannock*

*Tribes*, 465 F.3d at 1095.  The defendants respond that the proposed amendment would

be futile because the Tribes are entitled to sovereign immunity.  *Allen v. Gold Country*

*Casino*, 464 F.3d 1044, 1047 (9th Cir. 2006).  The Court agrees.  The proposed

**Memorandum Decision & Order - 13**

amendment contains no claim that the Tribes have waived their immunity or otherwise consented to suit.

The plaintiffs counter that the Court has jurisdiction over the Tribes through the All Writs Act. It states that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *See* 28 U.S.C. § 1651(a).

The Act, however, "is not a grant of plenary power to the federal courts," but instead "is designed to preserve jurisdiction that the court has acquired from some other independent source in law." *Doe v. INS*, 120 F.3d 200, 204-05 (9th Cir.1997). The Act does not constitute a waiver of sovereign immunity. *Stimac v. Haag*, 2010 WL 3835719 (N.D.Cal. September 29, 2010). Hence, the Act cannot be used to waive the Tribes' sovereign immunity, and does not provide an independent source of jurisdiction over the Tribes.

Plaintiffs argue, however, that the Court has the authority under the Act to order the Tribes to take action in another case in which the Tribes are parties: *Shoshone Bannock Tribes v. State of Idaho*, CV-01-52-E-BLW. The plaintiffs argue that the Tribes waived their sovereign immunity by filing suit in that action, *see Reply Brief, Dkt. 45* at p. 4, and that the All Writs Act gives this Court authority to enforce the Ninth Circuit's decision that "an amendment of the Tribes' Compact is *required* for the Tribes to be able to operate their video gaming machines . . . ." *Shoshone-Bannock Tribes*, 465 F.3d at 1099 (emphasis added). Defendants counter that plaintiffs were not parties to that action

and hence cannot use the Act to compel those who were parties to take some action.

The All Writs Act does "convey[] subject matter jurisdiction to protect a prior judgment from threats by parties and nonparties alike." *Sandpiper Village Condominium Ass'n Inc. v. Louisiana-Pacific Corporation*, 428 F.3d 831, 841 n. 14 (9th Cir. 2005). The Act clearly gives the Court authority to issue a writ of mandamus against nonparties who are frustrating a prior judgment of the Court. *Id*.

Plaintiffs are, however, using the Act in a different manner – they seek to compel action in a case to which they were not parties, and which no party has requested. Plaintiffs cite a case where a newspaper used the Act to overturn a court's decision barring reporters from interviewing jurors in a criminal case. *U.S. v. Sherman*, 581 F.2d 1358 (9th Cir. 1978). The newspaper was seeking to compel action in a case to which it was not a party, the same thing plaintiffs are doing here, they argue. But *Sherman* would be truly aligned with this case only if the newspaper in *Sherman* was trying to compel the Government or the criminal defendant to take some action. Plaintiffs cite no case going that far, and yet that is what they seek here. The lack of authority cited by plaintiffs for extending the Act in this manner makes the Court reluctant to take that step.

A cardinal requirement for the issuance of a writ under the Act is that the moving party has no other adequate means to attain relief. *See U.S. v. W.R. Grace*, 504 F.3d 745, 757 (9th Cir. 2007). Moreover, the Act's remedy – a writ of mandamus – is "an extraordinary remedy justified only in exceptional circumstances." *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 289 (1988). Here, as explained more fully

below, the Court will allow plaintiffs to pursue a judicial review of the Secretary's decision approving the Compacts. Hence, this case does not present the extraordinary need required to trigger application of the All Writs Act.

For all these reasons, the motion to amend will be denied. The operative complaint for purposes of deciding the pending motions is the First Amended Complaint. *See First Amended Complaint, Dkt 4.*

## Secretary's Motion to Dismiss – Standing

The Secretary argues that plaintiffs Knox and Dotson lack standing. The requirements for demonstrating standing are well-established. As an "irreducible minimum," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 472 (1982), plaintiffs must show (1) a concrete and imminent "injury in fact", (2) a causal connection between the defendants and the alleged injury, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Knox and Dotson satisfy the first requirement. Their "injury in fact" consists of the tens of thousands of dollars they lost as a result of their addiction to video gaming that was available through the allegedly improper actions, or inactions, of the Secretary. *See Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998) ("[t]he Court routinely recognizes . . . economic injury resulting from governmental actions . . . as sufficient to satisfy the Article III 'injury in fact' requirement").

The Secretary argues, however, that plaintiffs cannot establish causation because

video gaming is available due to the actions of the Tribes and the State of Idaho, not the Secretary. To demonstrate causation, the plaintiffs' gambling addiction harm must be "fairly traceable" to the Secretary's conduct, *Pritikin v. Dep't of Energy*, 254 F.3d 791, 796 (9th Cir.2001), and the injuries must not be " the result of the independent action of some third party not before the court. " *Lujan,* 504 U.S. at 560 (internal quotation omitted). Further,

> [w]hen . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed [than when the plaintiff is the subject of the government's regulation]. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction-and perhaps on the response of others as well.

*Lujan*, 504 U.S. at 562, 112 S.Ct. 2130 (emphasis in original);

In this case, plaintiffs's allegations are sufficient to infer that their gambling addiction is fairly traceable to the Secretary's approval of the Tribes Compact in 2000 and subsequent failure to rescind that approval. It is true that the conduct of the Tribes and State have contributed to plaintiffs' injury. And, as discussed more below, the Secretary has never formally authorized the video gaming that is being conducted at Fort Hall. But the only reason that video gaming occurs at Fort Hall is that a Compact exists, approved by the Secretary. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1556 (10th Cir. 1997) (holding that "the existence of a valid compact is a requirement [under IGRA] for conducting Class III gaming"). Even if the Compact does not expressly authorize video gaming, the Tribes and Governor allege that its most-favored-nation provision allows the

Tribes to conduct video gaming.  So the Compact is critical – indeed indispensable – to the Tribes' video gaming.  The video gaming caused plaintiffs' injuries, and the Compact that now allows that video gaming was approved by the Secretary.  The Court therefore finds that the plaintiffs' injuries are "fairly traceable" to the Secretary.

To establish redressability, the final element, plaintiffs must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 869 (9th Cir.2002).  A "claim may be too speculative if it can be redressed only through 'the unfettered choices made by independent actors not before the court.' " *Id.* (quoting *Lujan,* 504 U.S. at 560).  However, a plaintiff can still satisfy the redressability requirement in such a case by meeting "the burden . . . to adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability of injury."  *Lujan*, 504 U.S. at 562.  "Plaintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision."  *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir.1998).

The Secretary argues that plaintiffs cannot assume that setting aside the Compact would lead to prosecution or that prosecution would redress plaintiffs' alleged injury.  The Secretary points out that plaintiffs have conceded that they cannot compel defendants to prosecute the Tribes under federal law.  *See Plf Brief (Dkt. 22)* at 12.

A similar issue was faced in *Artichoke Joe's v. Norton*, 216 F.Supp. 2d 1084 (E.D.Cal. 2002), where plaintiffs were private gambling clubs challenging compacts that

gave tribes the exclusive right to practice Class III gaming. The defendants made the identical argument the Secretary makes here, that there is no certainty that prosecutions would follow if the compacts were struck down. District Judge David Levi rejected that argument, holding that although "redressability may depend, at least in part, on the actions of third parties," a ruling "that invalidates the compacts . . . would conclusively establish the illegality of any continued Class III gaming" and the "court is entitled to expect that [federal prosecutors] will follow the law." *Id.* at 1109. On appeal, the Ninth Circuit stated that "[w]e agree with the district court's cogent application of U.S. Supreme Court precedent regarding constitutional standing." *Artichoke Joe's v. Norton*, 353 F.3d 712, 719 n. 9 (9th Cir. 2003).

The Secretary responds that this case is distinguishable from *Artichoke Joe's* because invalidating the Tribes' Compact would not conclusively establish the illegality of video gaming. The reason, the Secretary alleges, is that "the Ninth Circuit [in *Shoshone Bannock Tribes*, 465 F.3d at 1095] concluded that the gaming taking place at Fort Hall Casino is lawful." *Dft Brief (Dkt. 26)* at 5.

The Court disagrees; the Ninth Circuit never made such a broad pronouncement. The only issues before it were whether the Tribes had to renegotiate the Compact and whether the State limitations applied to the Tribes. The Circuit never reviewed the Secretary's approvals of the Compacts as this Court is asked to do. If this Court grants plaintiffs' requested relief, and strikes down the Compacts, there is no conflicting decision from the Ninth Circuit that might give prosecutors pause. Accordingly, the

analysis in *Artichoke Joe's* applies with equal strength to this case – the Court is entitled to expect that federal prosecutors will follow the law if the Compacts are struck down. That is sufficient for redressability.

The Secretary also argues that with other types of gambling so widely available, removing video gaming machines from the Casino would not ultimately cure plaintiffs' gambling addiction. Yet plaintiffs addressed this point when they alleged that they gamble "almost exclusively" at Fort Hall Casino and played "only" the video gaming machines. *See Amended Complaint, Dkt. 4* at ¶ 28. All inferences must be granted in favor of the plaintiffs, *Bernhardt,* 279 F.3d at 867, and one reasonable inference is that plaintiffs' gambling addiction is tied directly and exclusively to the Tribes' video gaming machines. Once again, plaintiffs need not demonstrate that there is a "guarantee" that their injuries will be addressed by a favorable decision, but need only show that it is "likely" as opposed to "merely speculative" that a favorable decision will redress their injury. *Id*. at 869. They have made that showing.

The Secretary counters that if the plaintiffs gambled only at Fort Hall, they have no injury from the gambling offered by the other three Idaho tribes and thus have no standing to challenge those Compacts. However, as will be discussed further below, the only reason the Tribes brought video gaming to Fort Hall was that the Secretary approved the amendments of the northern tribes, triggering the most-favored-nation provision of the Tribes' compact. Thus, the plaintiffs' injuries are fairly traceable to the Secretary's approval of those amendments. Moreover, those injuries would be redressed if the

approvals are reversed because the Tribes could no longer rely on the most-favored-nation provision to conduct video gaming at Fort Hall.

The plaintiffs therefore have standing to challenge all four Compacts, and the Court will accordingly deny the Secretary's motion to dismiss on standing grounds.

## Indispensable Party

The Secretary argues that the case should be dismissed under Federal Rule of Civil Procedure 12(b)(7) because the four Idaho tribes, and the State, are indispensable parties under Rule 19. A Rule 19 motion poses "three successive inquiries." *EEOC v. Peabody Western Coal Co.,* 610 F.3d 1070, 1078 (9th Cir. 2010). First, the court must determine whether a nonparty should be joined under Rule 19(a). If an absentee is a necessary party under Rule 19(a), "the second stage is for the court to determine whether it is feasible to order that the absentee be joined." *Id.* If joinder is not feasible, the court must determine whether the case can proceed without the absentee or whether the case should be dismissed because the absentee is an indispensable party. *Id.* An indispensable party is one who "not only [has] an interest in the controversy, but [has] an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." *Id.*

Turning to the first inquiry, Rule 19(a)(1)(B) requires joinder of a person if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or

impede the person's ability to protect the interest." Here, a decision striking down the

Compacts at issue would have a substantial and serious financial impact on the Tribes.

*See Wilbur v Locke*, 423 F.3d 1101, 1112 (9th Cir. 2005) (threat to tribal compacts makes

tribes necessary parties under Rule 19(a)), *overruled on other grounds, Levin v.*

*Commerce Energy, Inc.,* 130 S.Ct. 2323 (2010).

However, the four Idaho tribes are not necessary parties under Rule 19(a) if their

interests are adequately protected by the Secretary. *Artichoke Joe's,* 216 F.Supp.2d at

1118 ("although the tribes can claim a legal interest in this lawsuit, they are not necessary

parties because their legal interest can be adequately represented by the Secretary"). In

*Artichoke Joe's*, the court held that the Government's trust obligation to the tribes

"satisfies the representation criteria and allows it to adequately represent the absent tribes

unless there exists a conflict of interest between the United States and the tribe." *Id.*

(quoting *Southwest Ctr. for Biological Diversity v. Babbitt,* 150 F.3d 1152, 1154 (9th

Cir.1998)). To prevail on a claim that the United States cannot adequately represent the

Tribe's interest, the Secretary must not only identify the alleged conflict but demonstrate

how such a conflict might actually arise under the facts of the case. *Washington v. Daley*,

173 F.3d 1158, 1168 (9th Cir. 1999).

In *Artichoke Joe's*, the court held no showing had been made of a specific conflict

under the facts of that case. On appeal, the Circuit noted that it would not review this

portion of the lower court's holding, but then observed that ""[t]he Secretary's interests

are not adverse to the tribes' interests and the Department of Interior has the primary

responsibility for carrying out the federal government's trust obligation to Indian tribes."
*Artichoke Joe's*, 353 F.3d at 719 n. 10.

That Circuit analysis, the Secretary argues here, is mere *dicta*. The Court agrees. The Circuit made the statement as an aside after finding that it was not an issue in the case.

Unable to find direct authority in the Ninth Circuit, the Secretary offers decisions from other courts to support its argument that the Secretary's interests are not aligned with the Idaho tribes. *See Pueblo of Santa Ana v Kelly*, 932 F.Supp. 1284 (D. N.M. 1996); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. U.S.*, 259 F.Supp. 2d 783 (W.D.Wis. 2003). Those courts rejected tribal claims that the IGRA imposed on the United States a fiduciary duty to protect tribal rights, a higher duty than the limited trust relationship generally applicable. *See United States v. Mitchell,* 445 U.S. 535, 542 (1979) (*"Mitchell I"*) (indicating that only a limited trust relationship exists between tribes and the United States unless statute unambiguously imposes a duty on the government to act).

Those cases are distinguishable. The Rule 19 analysis does not require plaintiffs to show that IGRA imposes on the United States a fiduciary duty. The more limited trust relationship – discussed in *Mitchell I* and applicable here – serves plaintiffs' purposes by placing the burden on the Secretary to not only identify an alleged conflict with the tribal interests but also to explain how that conflict "might actually arise under the facts of this case." *Daley*, 173 F.3d at 1168.

**Memorandum Decision & Order - 23**

With regard to the three northern compact amendments, the Secretary approved those amendments and hence has every incentive to zealously defend its approval. The Secretary identifies no arguments the northern tribes could make to defend the Secretary's approvals that the Secretary himself would not make, or not make as well. *Id*. at 1167 (asking whether present party will "undoubtedly make all" of the absent party's arguments and whether the absent party would offer anything "that the present parties would neglect").

With regard to the Tribes' compact, the Secretary argues that it "has not been asked to take any action with regard to any amendments" and thus "is not in a position at this time to advocate on the legality of the gaming being undertaken by [the Tribes]." *Dft Brief (Dkt.17)* at 16. The Secretary's professed neutrality, however, is belied by its approval of the northern tribes' amendments. As discussed further below, it is those approvals that triggered the Tribes' most-favored-nation provision, under which they now conduct video gaming. So the video gaming conducted by all Idaho tribes depends entirely on the Secretary's approval of the northern tribes' amendments.

With tribal interests so aligned, this case does not present a situation like that found in *Makah Indian Tribe v Verity*, 910 F.2d 555 (9th Cir. 1990). There, the absent tribes were found necessary because their interests "conflict[ed] among themselves," making it impossible for the Secretary to represent them all. *Id.* at 557. In contrast, the Idaho tribes all have the same interest in upholding the Secretary's approvals of the northern tribes' amendments.

**Memorandum Decision & Order - 24**

The Secretary's burden under *Daley* is to point out how its interests conflict with the tribes – or the tribes conflict among themselves – concerning the Secretary's approvals of the northern amendments. The Secretary has not carried that burden.

For all of these reasons, the Court finds that the Tribes are not necessary parties under Rule 19(a). Accordingly, the Court need not consider whether they are indispensable parties under Rule 19(b). *Daley*, 173 F.3d at 1169 (stating that "[b]ecause we conclude that the Tribes are not necessary parties, we need not consider whether they are indispensable parties under Rule 19(b)").

The Secretary also argues that the State of Idaho is necessary and indispensable. Clearly the State has a significant interest in maintaining the compacts it entered into with the Tribes. However, no provision of Rule 19(a)(1) applies to the State. Taking up subsection (A), complete relief can be accorded in the State's absence – in this APA review of the Secretary's decision, the Court has available the full range of APA relief even with the State being absent. Turning to subsection (B)(I), the validity of the Secretary's approvals under the APA must stand or fall based on the Secretary's defense of those approvals. The Secretary has not shown that the State would offer something that the Secretary would neglect. Finally, under subsection (B)(ii), there is no risk that an existing party, the Secretary, would incur multiple or inconsistent obligations.

The Court shall therefore reject the Secretary's motion under Rule 12(b)(7) to dismiss this case for the failure to join an indispensable party under Rule 19.

**Final Agency Action & Statute of Limitations**

**Memorandum Decision & Order - 25**

As a sovereign, the United States and its agencies may be sued only when Congress has consented to suit. *Mitchell I* 445 U.S. at 538. In this case, plaintiffs rely on the limited waiver of sovereign immunity provided by the Administrative Procedures Act ("APA") that allows challenges to agency actions that have injured a plaintiff. *See* 5 U.S.C. § 704. That waiver is subject to the general six-year statute of limitations applicable to claims against the United States. *See* 28 U.S.C. § 2401(a).

The Secretary argues that this action is untimely because it was brought nine years after the last agency action, the Secretary's approval in 2000 of the four compacts. The Court disagrees. As the Secretary points out in his next argument, those four compacts did not authorize video gaming in 2000. Thus, plaintiffs had no injury –or right to sue – in 2000, and the limitations period could not have started at that time. *See Acri v. International Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1396 (9th Cir. 1986) (holding that "[u]nder federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action"). It was not until sometime after 2004 – at a point after the Secretary approved the northern tribes' amendments, the Tribes started video gaming under their most-favored-nation provision, and the plaintiffs became addicted – that the limitations period started running under *Acri*. This action, filed in 2009, was therefore timely.

The Secretary argues that with regard to the Tribes' Compact, it has never made a

decision authorizing video gaming.[2]  Thus, according to the Secretary, plaintiffs run afoul of the APA requirement that they challenge "final agency action."  *Lujan*, 497 U.S. at 882.[3]

The Secretary's finality defense raises an immediate question:  If the Secretary has never approved video gaming, why have the Tribes been openly conducting such gaming for more than five years?  An answer is provided in the Governor's briefing, explaining that the Tribes are conducting video gaming under the most-favored-nation provision of the Compact.  *See Dft's Brief (Dkt. 8)* at 6.  This Court noted in its earlier litigation the agreement of the Governor and the Tribes on this issue:  "Both parties [the State and the Tribes] agree that [the most-favored-nation provision of the Compact] authorizes the Tribes to also operate tribal video gaming machines."  *see also Shoshone Bannock Tribes, supra*, at 12.

By approving the amendments to the northern tribes' compacts, the Secretary triggered the most-favored-nation provision of the Tribes' compact, allowing the Tribes to immediately begin video gaming without further approvals from the Secretary.  This

_____

[2]  The Secretary clearly issued a final decision approving the amendments to the northern tribes' compacts allowing video gaming, and so this finality defense only applies to the Tribes' Compact.

[3]  There is an unresolved issue in Ninth Circuit jurisprudence over whether a plaintiff seeking only injunctive and declaratory relief is limited to the final agency action requirement. *See EEOC v. Peabody Western Coal Co.,* 610 F.3d 1070, 1086 (9th Cir. 2010) (observing the conflict in Ninth Circuit case law but declining to resolve it).  It appears to the Court that *Lujan* has settled the issue and requires that plaintiffs show either that the agency has rendered a final decision or is "unlawfully withh[olding] or unreasonably delay[ing]" action.  *See* 5 U.S.C. § 706(1).

result was anticipated. The most-favored-nations provision of the Tribes' compact is a central part of the compact and easy to understand. The clear inference of plaintiffs' complaint – an inference that must be drawn in plaintiffs' favor – is that the Secretary understood that his approval of the northern tribes' amendments would give the green light for the Tribes to conduct video gaming.

For an agency action to be final, it must meet two conditions: "the action must mark the 'consummation' of the agency's decision-making process," and it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Both conditions exist here. The Secretary's action – approving the three amendments that triggered the most-favored-nation provision – marked the "consummation" of the process because nothing further was required to authorize the Tribes to begin video gaming. That same action determined legal rights because that video gaming is being legally justified under the most-favored-nation provision.

In construing the phrase "final action," the Supreme Court held that "[t]he bite . . . is not in the word 'action,' which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word 'final,' which requires that the action under review mark the consummation of the agency's decision making process." *Whitman v. American Trucking Associations*, 531 U.S. 457, 478 (2001) (interpreting the Clean Air Act's use of the phrase "final action," which the Court held "bears the same meaning . . . that it does under the [APA]"). In other words, the Court is

to more expansively interpret the word "action" than the word "final." If action includes "every manner in which an agency may exercise its power," the Secretary certainly exercised its power here to permit the Tribes to conduct video gaming by approving the northern tribes amendment, which had the automatic effect – without further Secretarial action and pursuant to a compact earlier approved by the Secretary – of allowing the Tribes to conduct video gaming.

For all these reasons, the Court finds that plaintiffs have sufficiently pled final agency action with respect to their claim seeking APA review of the Secretary's decisions.

### Governor's Motion to Dismiss

The Governor seeks dismissal under Rule 12(b)(1) on the ground that the Court lacks subject matter jurisdiction over plaintiffs' claims. Resolution of this motion requires the Court to define plaintiffs' claims against the Governor.

The plaintiffs' complaint states that "[t]his action arises under the [IGRA]." *See Amended Complaint (Dkt. 4)* at ¶ 1. The plaintiffs allege that the Governor's approvals of the compacts "contravene IGRA, the Johnson Act, and the Supremacy Clause . . . ." *Id*. at ¶ 26.

The Governor argued in his briefing that there is no private right of action under the Johnson Act. Plaintiffs did not oppose those arguments, and the Court will therefore dismiss the Johnson Act claim.

The Governor also argues that there is no private right of action under IGRA. The

Court agrees.  *See Hein v. Capitan Grande Band of Diegueno Mission Indians*, 201 F.3d 1256, 1260 (9th Cir. 2000) (holding that "IGRA provides no general private right of action").

Plaintiffs respond that "it is irrelevant whether IGRA grants plaintiffs a private right of action" because they are suing under the Supremacy Clause.  Plaintiffs cite *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009) for its holding that "[a] cause of action based on the Supremacy Clause obviates the need for reliance on third-party rights because the cause of action is one to enforce the proper constitutional structural relationship between the state and federal governments and therefore is not rights-based."  *See also, Indian Oasis-Baboquivari Unified School Dist. No. 40 v Kirk*, 91 F.3d 1240, 1256 (9th Cir. 1996) (holding that "[t]he best explanation of *Ex Parte Young,* 209 U.S. 123 (1908) and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws").  Plaintiffs argue that they are seeking to "enforce the structural relationship between the State of Idaho and the United States."  *See Plf Brief (Dkt.12)* at 11.  They assert that the Governor "continues to flout" the IGRA requirement that Idaho law permit video gaming by relying on Idaho Code § 67-429B, "which is patently unconstitutional."  *Id*.

The Supremacy Clause provides that the law of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  *See* U.S. Const. art. VI, cl. 2.  Plaintiffs are not arguing that

any Idaho statute should be struck down or ignored because it conflicts with – or is preempted by – some federal law. They argue instead that the two Idaho statutes passed in the wake of Proposition One violate the *Idaho* constitution. That is purely a matter of state law, and does not implicate the Supremacy Clause.

If plaintiffs prevail on their claim that the Idaho statutes violate the Idaho constitution, they will argue that the Secretary's approvals violated IGRA's provision that the gambling must be legal to be approved. That claim, however, seeks a simple administrative review of the Secretary's approval under the APA – a claim discussed above that is going forward in this case. It too fails to implicate the Supremacy Clause.

The Court therefore finds that it has no jurisdiction under the Supremacy Clause, the Johnson Act, or the IGRA. Accordingly, the Court will grant the Governor's motion to dismiss under Rule 12(b)(1).

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the plaintiffs' motion to amend (docket no. 23) is DENIED.

IT IS FURTHER ORDERED, that the Governor's motion to dismiss (docket no. 8) is GRANTED.

IT IS FURTHER ORDERED, that the Secretary's motion to dismiss (docket no. 17) is DENIED.



DATED:  **December 27, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge